

# UNITED STATES DISTRICT COURT
## EASTERN DISTRICT OF MICHIGAN
### SOUTHERN DIVISION

DETROIT FREE PRESS, INC.,
a Michigan corporation, and
HERALD CO., INC. d/b/a/ ANN ARBOR NEWS,
a New Jersey corporation,

      Plaintiffs,

v.

JOHN ASHCROFT,
Attorney General of the United States,
HON. MICHAEL CREPPY,
Chief Immigration Judge of the United States, and
HON. ELIZABETH HACKER,
United States Immigration Judge,

      Defendants.



U.S. District Court
Case No.

Hon.

---

## PLAINTIFFS' MOTION FOR INJUNCTIVE RELIEF
## AND EARLIEST POSSIBLE HEARING DATE

Plaintiffs Detroit Free Press, Inc. ("Free Press"), by its counsel Honigman Miller Schwartz and Cohn LLP, and Herald Company, Inc. d/b/a Ann Arbor News ("Ann Arbor News"), by its counsel Soble & Rowe LLP, hereby move this Court for a preliminary and permanent injunction requiring Defendants to permit Plaintiffs access to all future proceedings related to Rabih Haddad, and to produce to Plaintiffs forthwith transcripts of all related proceedings already held, and copies of all documents related to the case. By closing the Haddad proceedings to the public and press without any of the specific findings required by the Supreme Court, Defendants are in violation of the Constitution and federal statutory and regulatory law.



Moreover, because each day that Plaintiffs are denied access to the Haddad proceedings causes irreparable damages to their First Amendment rights, Plaintiffs request that this Motion be scheduled for hearing at the earliest possible time.

The factual and legal bases for this motion are explained in the supporting brief.

Respectfully submitted,

HONIGMAN MILLER SCHWARTZ AND COHN LLP

By: _____
    Hershel P. Fink
    Brian D. Wassom
Attorneys for Plaintiff Detroit Free Press
2290 First National Building
Detroit, Michigan 48226
(313) 465-7400


SOBLE & ROWE LLP


By: _____
    Jonathan D. Rowe
Attorneys for Plaintiff Herald Co., Inc.
  d/b/a/ Ann Arbor News
221 N. Main St. #200
Ann Arbor, MI 48104
(734) 662-9252

DATED: January 29, 2002
DET_C\468457.1

2

# UNITED STATES DISTRICT COURT
## EASTERN DISTRICT OF MICHIGAN
### SOUTHERN DIVISION

DETROIT FREE PRESS, INC.,
a Michigan corporation, and
HERALD CO., INC. d/b/a/ ANN ARBOR NEWS,
a New Jersey corporation,

       Plaintiffs,

v.

JOHN ASHCROFT,
Attorney General of the United States,
HON. MICHAEL CREPPY,
Chief Immigration Judge of the United States, and
HON. ELIZABETH HACKER,
United States Immigration Judge,

       Defendants.

_____/

U.S. District Court
Case No.

Hon.

## BRIEF IN SUPPORT OF PLAINTIFFS' MOTION FOR INJUNCTIVE RELIEF AND EARLIEST POSSIBLE HEARING DATE



Herschel P. Fink
Brian D. Wassom
Honigman Miller Schwartz and Cohn LLP
Attorneys for Plaintiff Detroit Free Press
2290 First National Building
Detroit, MI 48226
(313) 465-7400

Jonathan D. Rowe
Soble & Rowe LLP
Attorneys for Plaintiff Herald Co., Inc.
 d/b/a/ Ann Arbor News
221 N. Main St. #200
Ann Arbor, MI 48104
(734) 662-9252

## STATEMENT OF ISSUES

The public and the press enjoy a fundamental right of access to civil judicial proceedings, including deportation hearings. This right is guaranteed by the First Amendment as well as statutory and regulatory law, and may only be curtailed under narrow circumstances based on case-specific findings. Defendants have ordered certain deportation proceedings closed without any case-specific reasons. Should this Court order the proceedings to be opened?

## CONTROLLING AUTHORITIES

*Brown & Williamson Tobacco Corp. v. Fed. Trade Comm'n*,
    710 F.2d 1165 (6th Cir. 1983)

*Globe Newspapers Co. v. Superior Court*,
    457 U.S. 596 (1982)

*Pechter v. Lyons*,
    441 F. Supp. 115 (S.D.N.Y. 1977)

*Press-Enterprise Co. v. Superior Court*,
    464 U.S. 501 (1984)

*Press-Enterprise Co. v. Superior Court*,
    478 U.S. 1 (1986)

*Society of Prof. Journalists v. Sect'y of Labor*,
    616 F. Supp. 569 (D. Utah 1985)

## **TABLE OF CONTENTS**

STATEMENT OF ISSUES.........................................................................................................i

CONTROLLING AUTHORITY ...............................................................................................ii

TABLE OF AUTHORITIES .....................................................................................................v

I. INTRODUCTION...................................................................................................................1

II. STATEMENT OF FACTS.....................................................................................................2

III. ARGUMENT........................................................................................................................2

    A.    The Free Press Has Standing
           to Challenge the Closure ...........................................................................................2

    B.    The Public and Press Have a Constitutional Right of
           Access to Haddad's Proceedings and Records ..........................................................3

          1.    Supreme Court Precedent Has Established A First
               Amendment Right of Access To Judicial Proceedings ....................................3

          2.    The First Amendment Right of Access
               Extends Beyond Criminal Trials .....................................................................5

          3.    The Right of Access and the Principles Underlying
               It Apply Equally To Civil Proceedings .............................................................6

          4.    The Same Principles Apply To
               Quasi-Judicial Administrative Proceedings .....................................................8

               a.    The "Favorable Judgment of Experience"
                     Requires Openness in Administrative Hearings......................................8

               b.    Openness is Essential to the Proper Functioning
                     of an Administrative Hearing.................................................................11

          5.    Regulations and History Provide
                Open Access to Immigration Hearings............................................................12

          6.    All of These Considerations Mandate
               Right of Access to Haddad's Proceedings.......................................................12

    C.    Defendants' Closure of Haddad's Proceedings
           Without a Hearing and Case-Specific Findings

Violates the Constitutional Right of Access ............................................................ 14

    1.    Once a Presumption of Access Adheres,
          Access May Be Limited Only in Narrow
          Circumstances and Upon Specific Findings .................................................. 14

    2.    Defendants' Categorical Denial of Access
          Deprived the Free Press of Due Process ...................................................... 15

D.    Independently of Constitutional Claims, INS
       Regulations Also Entitle The Free Press to Access ................................................. 16

    1.    8 C.F.R. § 3.27 Provides a Private
          Cause of Action ........................................................................................... 16

    2.    The Regulation's Exceptions Do Not
          Justify The Closure ...................................................................................... 16

    3.    Injunctive Relief Is Also Available Under
          The APA or Mandamus Statutes .................................................................. 17

    4.    The Requirement of Exhausting Administrative
          Remedies Would Not Apply in This Case .................................................... 18

E.    This Motion Should Be Heard Forthwith, As Continued .......................................... 19
       Closure Will Irreparably Harm the Public Interest

IV. CONCLUSION ....................................................................................................................... 20

## TABLE OF AUTHORITIES

### CASES

*Baltimore Sun Co. v. Mayor and City Council of Baltimore,*
   755 A.2d 1130 (Mary. Ct. App. 2000) ............................................................. 8

*Brown & Williamson Tobacco Corp. v. Fed. Trade Comm'n,*
   710 F.2d 1165 (6th Cir. 1983) ................................................................... 8, 14

*CBS, Inc. v. Young,*
   522 F.2d 234 (6th Cir. 1975) ......................................................................... 3

*Courier Jnl. v. Gash,*
   9 Media L. Rep. 1735 (Ky. Cir. Ct. 1983) ..................................................... 10

*Craig v. Harney,*
   331 U.S. 367 (1947) ..................................................................................... 4

*Duncan v. Louisiana,*
   391 U.S. 145 (1968) ..................................................................................... 4

*EEOC v. Waffle House, Inc.,*
   No. 99-1823 (Jan. 15, 2002) ....................................................................... 17

*El Vocero De Puerto Rico (Caribbean Int'l News Corp.) v. Puerto Rico,*
   508 U.S. 147 (1993) ..................................................................................... 5

*Elrod v. Burns,*
   477 U.S. 347 (1976) ................................................................................... 21

*Fitzgerald v. Hampton,*
   467 F.2d 755 (D.C. Cir. 1972) ................................................... 9, 10, 11, 18

*Gannett Co. v. DePasquale,*
   443 U.S. 368, 61 L. Ed. 2d 608, 99 S. Ct. 2898 (1979) ................................. 8

*Globe Newspapers Co. v. Superior Court,*
   457 U.S. 596 (1982), ............................................................................. 4, 5, 6

*Haidar v. Coomey,*
   401 F. Supp. 717 (D. Mass. 1974). ............................................................. 16

*Heckler v. Ringer,*
   466 U.S. 602 (1984) ................................................................................... 18

*Holden v. Heckler,*
  584 F. Supp. 463 (N.D. Ohio 1984) ................................................................................ 20

*Houchins v. KQED, Inc.,*
  438 U.S. 1 (1978) ............................................................................................................ 12

*In re De Lorean Motor Co.,*
  755 F.2d 1223 (6th Cir. 1985)………………………………………………………………2

*In re Knoxville News-Sentinel,*
  723 F.2d 470 (6th Cir. 1983) ........................................................................................... 3

*Mathews v. Eldridge,*
  424 U.S. 319 (1976) ........................................................................................................ 19

*Morgan v. United States*
  304 U.S. 1 (1938) ...................................................................................................... 10, 11

*NBC Subsidiary (KNBC-TV), Inc. v. Superior Ct.,*
  980 P.2d 337 (Cal. 1999)................................................................................................. 8

*Nebraska Press Ass'n v. Stuart,*
  427 U.S. 539 (1976) ........................................................................................................ 20

*Pechter v. Lyons,*
  441 F. Supp. 115 (S.D.N.Y. 1977) .............................................................. 3, 10, 13, 17, 19

*Performance Unlimited v. Questar Publishers, Inc.,*
  52 F.3d 1373 (6th Cir. 1985) ........................................................................................... 2

*Perkovic v. INS,*
  33 F.3d 615 (6th Cir. 1994) ........................................................................................... 18

*Press-Enterprise Co. v. Superior Court,*
  464 U.S. 501 (1984) ......................................................................................................... 6

*Press-Enterprise Co. v. Superior Court,*
  478 U.S. 1 (1986) ............................................................................... 5, 6, 7, 11, 12, 15

*Publicker Ind., Inc. v. Cohen,*
  733 F.2d 1059 (3d Cir. 1984) .......................................................................................... 8

*Rafeedie v. INS,*
  880 F.2d 506 (D.C. Cir. 1989) ....................................................................................... 19

*Ramon-Sepulveda v. INS,*
    824 F.2d 749 (9th Cir. 1987) ................................................ 19

*Richmond Newspapers, Inc. v. Virginia,*
    448 U.S. 555 (1980) ...................................... 3, 4, 5, 6, 7, 14

*Smith v. SEC,*
    129 F.3d 356 (6th Cir. 1997) ................................................ 8

*Society of Prof. Journalists v. Sect'y of Labor,*
    616 F. Supp. 569 (D. Utah 1985) ........................ 8, 10, 12, 13

*Society of Prof. Journalists v. Sect'y of Labor,*
    832 F.2d 1180 (10th Cir. 1987) ............................................8

*Stieberger v. Heckler,*
    615 F.Supp. 1315 (S.D.N.Y. 1985) ..................................... 19

*United States v. Dickinson,*
    465 F.2d 496 (5th Cir. 1972) .............................................. 21

*Waller v. Georgia,*
    467 U.S. 39 (1984) ............................................................. 7

*In re App. & Aff. For Search Warrant (Wash. Post v. Hughes),*
    923 F.2d 324 (4th Cir. 1991) ............................................. 20

*Westmoreland v. CBS, Inc.,*
    752 F.2d 16 (2d Cir. 1984) .................................................. 8

*Zadvydas v. Davis,*
    121 S.Ct. 2491 (2001)....................................................... 6,8

## STATUTES

28 U.S.C. § 1361 ..................................................................... 18

8 C.F.R. § 3.27 ............................................................... 3, 13, 16

5 U.S.C. § 702 ....................................................................... 17

# MISCELLANEOUS

1 J. Bentham, *Rationale of Judicial Evidence* (1827) ................................................................ 15

L. Brandeis, *Other People's Money* (1933) ……….……………………………………………13

*Beyond*, 16 Harv. C.R. -- C.L.L. Rev. 430-31 (1981) .................................................................. 8

Cox, *Foreword: Freedom of Expression in the Burger Court*, 94 Harv. L. Rev. 1 (1980) ......... 8

3 Kenneth Culp Davis, *Admin. Law Treatise* (2d ed. 1980)……………………………………10

Note, *Open Meeting Statutes, The Press Fights for the Right to Know*, 75 Harv. L. Rev. 1199 (1962) ....................................................................................................................................... 12

Note, *Trial Secrecy and the First Amendment Right of Public
Access to Judicial Proceedings*, 91 Harv. L. Rev. 1899, 1921-23 (1978) .............................. 8

9 *Writings of James Madison* 103 (G. Hunt ed. 1910) ……………………………………………13

# I. **INTRODUCTION**

The allegations underlying this case are of great significance to the American public. This is not a case of mere public fascination with the activities of a local Muslim leader. Rather, it involves the Government's use of detentions and secret hearings that undermine society's confidence in the integrity of public institutions. In the process, it also raises serious questions of the Government's methods and tactics in dealing with those it suspects of being involved in terrorism, and of possible civil rights abuses toward Arab-Americans. In such cases and in such times as these, the public needs the assurance that only openness and a free flow of information can provide.

Rabih Haddad has been in federal custody for over a month, purportedly on a visa violation. He has been brought before an immigration court at least three times for hearings completely closed to the public, as well as to his family. No particularized findings were made by the Court as to why closure was essential. Instead, no less than the Attorney General of the United States has commanded, without disclosing any justification, that the proceedings be conducted in total secrecy. Indeed, the immigration court is not even permitted to admit that Haddad's case exists.

The public and press have a Constitutional right of access to court proceedings and records relating to them, and such proceedings and records are presumptively open. The need for openness is all the more vital in this case, which is of great public interest and importance, involving as it does innuendo of terrorist connections and the federal government's treatment of Arabs in America in the aftermath of September 11th. Secrecy in cases such as these feeds public suspicions and undermines confidence in the integrity of our governing agencies. As the Supreme Court has often ruled, the Constitution's Bill of Rights and the wisdom of history

1

instruct that only the uncensored flow of information will allow our free society to remain viable. This Court should heed these warnings, now more than ever.

## II. STATEMENT OF FACTS

For their Statement of Facts, Plaintiffs incorporate by reference the "Common Allegations" portion (¶¶ 5-15) of their Complaint, filed herewith.

## III. ARGUMENT

### A.    Plaintiffs Have Standing to Challenge the Closure[1]

Plaintiffs have standing to file this motion. Indeed, the right of the media to contest limitations on access to judicial proceedings is recognized as being of constitutional dimension. *Globe Newspapers Co. v. Superior Court*, 457 U.S. 596, 699 n.25 (1982) ("representatives of the press and general public must be given an opportunity to be heard on the question of their exclusion") (internal quotations and citations omitted); *In re Knoxville News-Sentinel*, 723 F.2d 470, 475 (6th Cir. 1983) ("The importance of the rights involved and interests served by those rights require that the public and press be given an opportunity to respond before being denied their presumptive right of access to judicial records"). Consistent with this principle, the Sixth Circuit has held that the media has standing to challenge even gag orders directed to the parties and their counsel, since such orders interfere with the media's ability to gather news, the

---

[1] This Court is required to consider four factors in reviewing a preliminary injunction motion: (1) Plaintiffs' likelihood of success on the merits; (2) the irreparable harm that could result to Plaintiffs if the injunction is not issued; (3) the possibility of substantial harm to others caused by the requested injunction; and (4) the impact on the public interest. *Performance Unlimited v. Questar Publishers, Inc.*, 52 F.3d 1373 (6th Cir. 1995). The Court is to balance all four factors, rather than focus on a particular one. *In re De Lorean Motor Co.*, 755 F.2d 1223, 1228-30 (6th Cir. 1985). As demonstrated herein, each of these factors favor Plaintiffs.

2

complement to the First Amendment right to publish news. *CBS, Inc. v. Young*, 522 F.2d 234 (6th Cir. 1975).

Standing is also independently afforded here to the public and their representative, the press, by INS regulations. 8 C.F.R. § 3.27 mandates that immigration court proceedings be open to the public except in narrow circumstances:

> All hearings, other than exclusion hearings, shall be open to the public except that:
>
> (a) Depending upon physical facilities, the Immigration Judge may place reasonable limitations upon the number in attendance at any one time with priority being given to the press over the general public;
>
> (b) For the purpose of protecting witnesses, parties, or the public interest, the Immigration Judge may limit attendance or hold a closed hearing.

The predecessor to this regulation, which contained almost identical wording, has been interpreted to give the public standing to demand access to immigration court proceedings. *Pechter v. Lyons*, 441 F. Supp. 115, 117-18 (S.D.N.Y. 1977). "Unless members of the general public have standing to assert their rights under this regulation, its purpose could conceivably be defeated by a secret collusive hearing or arbitrary prosecution." *Id.* at 118 (also citing concurring opinion of INS general counsel).

**B.  The Public and Press Have a Constitutional Right of Access to Haddad's Proceedings and Records**

      **1.  Supreme Court Precedent Has Established A First Amendment Right of Access To Judicial Proceedings**

In *Richmond Newspapers, Inc. v. Virginia*, 448 U.S. 555 (1980), the United States Supreme Court declared for the first time that the First Amendment guarantees both the press and public a right of access to judicial proceedings. The self-proclaimed "watershed" ruling, *id.*

3

at 582 (Stevens, J., concurring), stands for the proposition that the courtroom "is a public place where the people generally -- and representatives of the media -- have a right to be present." *Id.* at 578 (plurality opinion). Thus, in *Richmond Newspapers*, the Supreme Court invalidated an order closing a criminal trial to the press and public.

Two years later, *Richmond Newspapers* was reaffirmed and strengthened in *Globe Newspaper Co. v. Superior Court*, 457 U.S. 596 (1982). In *Globe*, the Court overturned a closure order barring the press and public from attending a rape trial during the testimony of a juvenile victim. The Court held that when the press and public are denied their right of access to a judicial proceeding, "it must be shown that the denial is necessitated by a compelling governmental interest, and is narrowly tailored to serve that interest." *Id.* at 607.

The *Globe* and *Richmond Newspapers* decisions proceed from the fundamental premise that the people have a right to know what occurs in their courts. As the Supreme Court itself has declared, "[w]hat transpires in the courtroom is public property." *Richmond Newspapers*, 488 U.S. at 583, n.9 (quoting *Craig v. Harney*, 331 U.S. 367, 374 (1947)). At their heart, *Globe* and *Richmond Newspapers* express a "profound judgment" that open judicial proceedings are critical to the functioning of "our free and democratic government." *Richmond Newspapers*, 448 U.S. at 592-593 (Brennan, J., concurring) (quoting *Duncan v. Louisiana*, 391 U.S. 145, 155 (1968)). The essential purpose of the First Amendment underlies both decisions:

> [T]he common understanding [is] that "a major purpose of the [the First] Amendment was to protect the free discussion of public affairs." By offering such protection, the First Amendment serves to ensure that the individual citizen can effectively participate in and contribute to our republican system of self-government.

*Globe*, 457 U.S. at 604.

4

Specifically, "[o]ne of the demands of a democratic society is that the public should know what goes on in the courts by being told by the press what happens there." *Richmond Newspapers*, 448 U.S. at 573, n. 9. Thus, the First Amendment right of access to judicial proceedings "ensure[s] that [the] constitutionally protected 'discussion of governmental affairs' is an informed one." *Globe*, 457 U.S. at 605. The guarantee of access "permits the public to participate in and serve as a check upon the judicial process -- an essential component in our structure of self-government." *Id*. at 606.[2]

### 2. The First Amendment Right of Access Extends Beyond Criminal Trials

In *Press-Enterprise v. Riverside County Superior Court*, 478 U.S. 1, 8 (1986) ("*Press-Enterprise II*"), the Court summarized its approach for determining whether the First Amendment right of access applies to a particular proceeding:

> In cases dealing with the claim of a First Amendment right of access to criminal proceedings, our decisions have emphasized two complementary considerations. First, because a tradition of accessibility implies the favorable judgment of experience . . . we have considered whether the place and process have historically been open to the press and general public. . . . .
>
> Second, in this setting the Court has traditionally considered whether public access plays a significant positive role in the functioning of the particular process in question.

(quotations and citations omitted). This "'experience' test . . . does not look to the particular practice of any one jurisdiction, but instead to the experience in that *type* or *kind* of hearing throughout the United States." *El Vocero De Puerto Rico (Caribbean Int'l News Corp.) v.*

---

[2]Moreover, public scrutiny of the trial process "enhances the quality and safeguards the integrity of the factfinding process," and "fosters an appearance of fairness, thereby heightening public respect for the judicial process." *Globe*, 457 U.S. at 606; *accord Press-Enterprise Co. v. Superior Court*, 478 U.S. 1, 8-9 (1986). As the Court explained in *Richmond Newspapers*, when court proceedings have "been concealed from public view an unexpected outcome can cause a reaction that the system at best has failed and at worst has been corrupted." 448 U.S. at 571.

5

*Puerto Rico*, 508 U.S. 147, 150 (1993) (quotations omitted, emphasis in original). Nor does it focus too narrowly on the factual circumstances of a particular case, but rather examines the general type of proceeding at issue. *Globe Newspaper*, 457 U.S. at 604-05 & n.13 (applying First Amendment inquiry to particular features of criminal justice system, not "the context of any particular criminal trial").

The Supreme Court itself has applied the First Amendment right of access to judicial proceedings beyond actual "trials." *Press-Enterprise II* (access right extends to preliminary proceedings in criminal cases); *Waller v. Georgia*, 467 U.S. 39, 48 (1984) (pretrial suppression hearings). As observed by Justice Stevens in an earlier concurring opinion, "the distinction between trials and other official proceedings is not necessarily dispositive, or even important, in evaluating the First Amendment issue." *Press-Enterprise Co. v. Superior Court*, 464 U.S. 501, 516 (1984) ("*Press-Enterprise I*") (order sealing transcript of voir dire proceedings in death case violated First Amendment right of access).

### 3. The Right of Access and the Principles Underlying It Apply Equally To Civil Proceedings[3]

The Sixth Circuit is among several courts having definitively confirmed that the same fundamental constitutional, historical, and policy analyses underlying the Supreme Court's decisions on the First Amendment right of access apply with equal vigor to civil proceedings:

> **The English common law, the American constitutional system, and the concept of the "consent of the governed" stress the "public" nature of legal principles and decisions.** Throughout our history, the open courtroom has been a fundamental feature of the American judicial system. Basic principles have emerged to guide judicial discretion respecting public access to judicial proceedings. These principles apply as well to the determination of whether to permit access to information contained in court documents because court records

---

[3] Haddad's deportation proceedings are civil. *Zadvydas v. Davis*, 121 S.Ct. 2491, 2499 (2001).

often provide important, sometimes the only, bases or explanations for a court's decision.

In the leading case of *Richmond Newspapers, Inc. v. Virginia*, 448 U.S. 555, 65 L. Ed. 2d 973, 100 S. Ct. 2814 (1980), the Supreme Court elaborated on the historical and philosophical underpinnings of the right of access . . . .

\* \* \*

**The Supreme Court's analysis of the justifications for access to the criminal courtroom apply as well to the civil trial.   The Supreme Court has acknowledged the broad application of these principles.**   Justice Burger's plurality opinion notes that "whether the public has a right to attend trials in civil cases is a question not raised by this case, but we note that historically both civil and criminal trials have been presumptively open." *Richmond Newspapers, supra*, at 580 n.17. Justice Stewart, concurring, states emphatically that "the First and Fourteenth Amendments clearly gives the press and the public a right of access to trials themselves, civil as well as criminal." *Id.* at 599. The historical support for access to criminal trials applies in equal measure to civil trials. *See Gannett Co. v. DePasquale*, 443 U.S. 368, 386, 61 L. Ed. 2d 608, 99 S. Ct. 2898 n.15 (1979) ("For many centuries, both civil and criminal trials have traditionally been open to the public.") *See also* Fenner & Koley, *Access to Judicial Proceedings: To* Richmond Newspapers *and Beyond*, 16 Harv. C.R. -- C.L.L. Rev. 430-31 (1981); Cox, *Foreword: Freedom of Expression in the Burger Court*, 94 Harv. L. Rev. 1, 156 n.42 (1980); Note, *Trial Secrecy and the First Amendment Right of Public Access to Judicial Proceedings*, 91 Harv. L. Rev. 1899, 1921-23 (1978).

**The policy considerations discussed in *Richmond Newspapers* apply to civil as well as criminal cases.**   The resolution of private disputes frequently involves issues and remedies affecting third parties or the general public. **The community catharsis, which can only occur if the public can watch and participate, is also necessary in civil cases.  Civil cases frequently involve issues crucial to the public -- for example, discrimination**, voting rights, antitrust issues, government regulation, bankruptcy, etc.

The concern of Justice Brennan that secrecy eliminates one of the important checks on the integrity of the system applies no differently in a civil setting. **In either the civil or the criminal courtroom, secrecy insulates the participants, masking impropriety, obscuring incompetence, and concealing corruption.**

**Finally, the fact-finding considerations relied upon by Justice Brennan obviously apply to civil cases.**   Openness in the courtroom discourages perjury and may result in witnesses coming forward with new information regardless of the type of the proceeding.

*Brown & Williamson Tobacco Corp. v. Fed. Trade Comm'n*, 710 F.2d 1165, 1177-79 (6th Cir. 1983) (footnote omitted, emphasis added);[4] *see Publicker Ind., Inc. v. Cohen*, 733 F.2d 1059, 1070 (3d Cir. 1984) (extensively surveying Supreme Court precedent and holding that the "presumption of openness inheres in civil trials as in criminal trials"); *Westmoreland v. CBS, Inc.*, 752 F.2d 16, 23 (2d Cir. 1984) (following *Publicker*).[5]

### 4.    The Same Principles Apply To <u>Quasi-Judicial Administrative Proceedings</u>

Even when the focus is narrowed specifically to administrative hearings rather than the civil justice system as a whole, a tradition of openness is found. The appropriate scope of the First Amendment inquiry here is "the broad spectrum of administrative hearings, rather than in narrow instances." *Society of Prof. Journalists v. Sect'y of Labor*, 616 F. Supp. 569, 575-76 (D. Utah 1985), *vacated as moot*, 832 F.2d 1180 (10th Cir. 1987).

### *a.    The "Favorable Judgment of Experience" <u>Requires Openness in Administrative Hearings</u>*

The Supreme Court has, on numerous occasions over the past century, held that the Due Process Clause of the Fifth Amendment requires public access to administrative proceedings, especially when such hearings are the types of quasi-judicial tribunals at issue here.[6] The

---

[4] This holding of *Brown & Williamson* has been followed as recently as *Smith v. SEC*, 129 F.3d 356, 359 n.1 (6th Cir. 1997) (*en banc*).

[5] *See also Baltimore Sun Co. v. Mayor and City Council of Baltimore*, 755 A.2d 1130 (Mary. Ct. App. 2000) (relying on same Supreme Court precedent to find common-law right of access to civil proceedings); *NBC Subsidiary (KNBC-TV), Inc. v. Superior Ct.*, 980 P.2d 337 (Cal. 1999) (ruling that First Amendment provides right of access to ordinary civil proceedings).

[6] It is beyond dispute that Haddad is entitled to the traditional guarantees of fairness and due process described above, regardless of his lack of citizenship. *Zadvydas v. Davis*, 533 U.S. 678, 121 S.Ct. 2491, 2500-01 (2001) ("Aliens who have once passed through our gates, even illegally, may be expelled only after proceedings conforming to traditional standards of fairness encompassed in due process of law.") This is especially true in a case such as this, where Haddad has been deprived of physical liberty. *Id*. at 2498 ("[f]reedom . . . from government . . . detention . . . lies at the heart of the liberty that [the Due Process] Clause protects"). One critical

8

underlying analysis is identical to that in the *Richmond Newspaper* line of cases – that our

democratic society cannot long survive without full public access to, and informed public

discussion on, governmental proceedings. This is especially true in the modern administrative

state. In *Fitzgerald v. Hampton*, 467 F.2d 755 (D.C. Cir. 1972), which held unconstitutional the

closure of a civil servant's termination hearing, the court retraced these precedents:

> "Where governmental action seriously injures an individual, and the
> reasonableness of the action depends on fact findings," the protections afforded
> by due process of law entitles the individual to a fair opportunity to show that the
> governmental action was unwarranted. . . . The Supreme Court has been "zealous
> to protect these rights from erosion. It has spoken out not only in criminal cases, .
> . . but also in all types of cases where administrative and regulatory actions were
> under scrutiny . . . .
>
> **"The requirement of 'due process' is not a fair-weather or timid assurance.
> It must be respected in periods of calm and in times of trouble; it protects
> aliens as well as citizens. . . .**
>
> "A fair trial in a fair tribunal is a basic requirement of due process. . . . But our
> system of law has always endeavored to prevent even the probability of
> unfairness." **That we regard an "open or public hearing" to be a
> fundamental principle of fair play inherent in our judicial process cannot be
> seriously challenged**. The Sixth Amendment requires a public trial in all
> criminal cases. Rule 77(b) of the Federal Rules of Civil Procedure requires that
> "all trials upon the merits shall be conducted in open court * * *." And **in
> administrative hearings, the rule of the "open" forum is prevailing -- if not
> by statutory mandate, then by regulation or practice.**
>
> Any lingering doubts as to the import of open hearings at the administrative level
> should have been put to rest by the Supreme Court's sanction of the "public
> proceedings" in *Federal Communications Commission v. Schreiber*. . . . The
> Court held that the agency had not abused its discretion in insisting upon an open
> hearing, even in an *investigatory* rather than an adjudicatory proceeding, saying,
> "the procedural rule, establishing a presumption in favor of public proceedings,
> **accords with the general policy favoring disclosure of administrative agency
> proceedings."**

element of this due process guarantee is that Haddad's hearings be open to the public.
*Fitzgerald*, 467 F.2d at 763-65. The discretion to close the proceedings against Haddad,
therefore, is severely curtailed by the Constitution even in the immigration context.

9

> Where administrative proceedings have been challenged on grounds of procedural due process, the Supreme Court's decisions have consistently distinguished the due process requirements in administrative proceedings of a quasijudicial character from the due process requirements in proceedings which are purely investigative and fact-finding.
>
> In *Morgan v. United States* [304 U.S. 1 (1938)], an order of the Secretary of Agriculture fixing the maximum rates to be charged by commission men at stockyards was held void for failure to allow the "full hearing" required by the applicable statute. The Court said this "goes to the very foundation of the action of administrative agencies entrusted by the Congress with broad control over activities which in their detail cannot be dealt with directly by the legislature. **The vast expansion of this field of administrative regulation in response to the pressure of social needs is made possible under our system by adherence to the basic principles . . . that in administrative proceedings of a quasi-judicial character the liberty and property of the citizen shall be protected by the rudimentary requirements of fair play. These demand 'a fair and open hearing,' -- essential alike to the legal validity of the administrative regulation and to the maintenance of public confidence in the value and soundness of this important governmental process. Such a hearing has been described as an 'inexorable safeguard.'** (Citations omitted.)" Even in informal proceedings, it has been held that these principles apply when constitutional rights are affected. . . . **This means that what was said and done in these informal proceedings . . . must have been done in an open forum** with notice and an opportunity for the traditional right of confrontation and cross-examination.

*Fitzgerald*, 467 F.2d at 763-65; *see also Society of Prof. Journalists*, 616 F. Supp. at 575 ("civil trials, which are analogous to administrative fact-finding proceedings, have historically been open to the public. It seems, therefore, that to the extent that there is a tradition of holding this type of hearing, there is a tradition that the hearings have been open to the public."); *Pechter*, 441 F. Supp. at 119 ("there is a general policy favoring disclosure of administrative agency proceedings."); 3 Kenneth Culp Davis, *Admin. Law Treatise* § 14:13, at 58-61 (2d ed. 1980) ("The prevailing tendency [is] to open all hearings of a somewhat formal character, overriding interests in privacy and in confidentiality").[7]

---

[7] *See also Courier Jnl. v. Gash*, 9 Media L. Rep. 1735 (Ky. Cir. Ct. 1983) (First Amendment requires public access to coroner's inquest, since it is "a public function . . . in all essential aspects at least equivalent to a judicial proceeding.")

Therefore, the "favorable judgment of experience," *Press-Enterprise II*, 478 U.S. at 8, confirms that any administrative hearing implicating any serious right must be conducted in the public view.

### b.    Openness is Essential to the Proper Functioning of an Administrative Hearing

The Supreme Court's long line of cases mandating public access to administrative hearings also confirms that public access "plays a significant positive role in the functioning of the particular process in question" here. *Press-Enterprise II*, 478 U.S. at 8. "The maintenance of proper standards [such as openness] on the part of administrative agencies in the performance of their quasi-judicial functions is of the highest importance and in no way cripples or embarrasses the exercise of their appropriate authority." *Morgan*, 304 U.S. at 22.

In mandating access to an administrative fact-finding hearing, the *Society of Prof. Journalists* court expanded on this analysis, echoing the Supreme Court's lengthy analysis in the *Richmond Newspaper* line of cases that openness is critical to the effective and honest functioning of governmental agencies, as well as to the performance of their cathartic function in public controversies:

> **Openness is crucially important to the [fact-finding] hearings . . . conducted.**
> A mine disaster that takes twenty-seven lives creates shock and sorrow in the mining community. Even though the disaster may have been the fault of no one, the emotional impact in the community is just as though a murder had taken place. An investigation into the causes of the disaster can create an emotional catharsis that soothes the community sorrow. If someone is responsible, people become aware of that. If no one is at fault, people can become reassured of that. **Access to the proceedings, where feasible, ensures that people realize that justice is being done.**
>
> **Moreover, openness ensures that [agency] properly does its job.**   Although Congress can conduct oversight hearings, they occur too long after the [agency] hearings to accomplish the purposes gained by openness.

11

Congressional oversight hearings can prevent future mistakes, but they can do little to correct past ones. In contrast, openness at the hearings can allow mistakes to be cured at once.

**The natural tendency of governmental officials is to hold their meetings in secret.** *See* Note, *Open Meeting Statutes, The Press Fights for the Right to Know*, 75 Harv. L. Rev. 1199, 1202-03 & n.21 (1962). They can thereby avoid criticism and proceed informally and less carefully. They do not have to worry before they proceed with the task that a careless remark may be splashed across the next day's headlines. **But it is exactly that type of public awareness and opportunity to criticize that is the very foundation of our democracy.**

Openness safeguards our democratic institutions.  Secrecy breeds mistrust and abuse.  As Justice Brandeis stated in words often quoted,

> Sunlight is said to be the best of disinfectants; electric light the most efficient policeman.

L. Brandeis, *Other People's Money* 62 (1933).  A right to open proceedings is necessary to prevent any governmental body from abusing the power it is given.

The federal government, particularly the executive branch, produces a vast amount of information.  **If the government is given the unfettered discretion to decide what information to make available to the press and the public, it has the power to distort the information and hide the truth.**  The first amendment guarantees of free speech and free press protect our right to freely criticize the government without fear of censorship by the government. But **censorship in speaking and publishing is not the only form of censorship that must be prevented.  The process of filtering information -- selectively releasing some information while withholding other information -- can be effectively used to prevent criticism and hide mistakes.  The first amendment guarantees apply to both forms of censorship.**

Without a first amendment right of access to some governmental information, our system of government by the people will not work. As James Madison noted,

> A popular Government, without popular information, or the means of acquiring it, is but a Prologue to a Farce or a Tragedy; or, perhaps both. Knowledge will forever govern ignorance: And a people who mean to be their own Governors, must arm themselves with the power which knowledge gives.

> 9 *Writings of James Madison* 103 (G. Hunt ed. 1910). *See also Houchins v. KQED, Inc.*, 438 U.S. 1, 30-35, 57 L. Ed. 2d 553, 98 S. Ct. 2588 (1978) (Stevens, J., dissenting) (quoting and discussing Madison's comment).

*Society of Prof. Journalists*, 616 F. Supp. at 575-76 (footnotes omitted, emphasis added).

12

Therefore, the second, "logical" half of the Supreme Court's First Amendment right-of-access inquiry also compels openness here, because public scrutiny is crucial to ensure that the immigration court does its job properly.

### 5.   Regulations and History Provide Open Access to Immigration Hearings

Citing the precedents listed above, the *Pechter* court ordered the precise relief sought here – a preliminary injunction granting public access to unconstitutionally closed deportation hearings. *Id*. at 120. *Pechter* found an INS regulation mandating open hearings to be "but one of the countless manifestations of a public policy centuries old that judicial proceedings . . . should be subject to public scrutiny." *Pechter*, 441 F. Supp. at 117. That provision is the predecessor to the current open-hearings regulation, 8 C.F.R. § 3.27, which contains virtually identical language. This regulation dates back to at least 1964, near the beginning of the modern administrative state.[8]

### 6.   All of These Considerations Mandate Right of Access to Haddad's Proceedings

All of the fundamental, constitutional justifications for openness listed above resoundingly demonstrate why public access must be permitted in this case. The public uproar over Haddad's detention, as evidenced by the hundreds of demonstrators that have accompanied each of his secret hearings, also strongly suggests the need for public access. As the Sixth Circuit explained in *Brown & Williamson*, "[t]he community catharsis, which can only occur if the public can watch and participate, is also necessary in civil cases. Civil cases frequently

---

[8] It has been suggested in some press reports that Haddad might petition for asylum in an upcoming hearing. While asylum hearings may not enjoy the same tradition of openness as other administrative hearings, any such concern in this case is allayed by Haddad's express desire for an open hearing. *See* Affidavit of Ashraf Nubani, Esq. (Exhibit F to the Complaint).

involve issues crucial to the public -- for example, discrimination . . . . In either the civil or the criminal courtroom, secrecy insulates the participants, masking impropriety, obscuring incompetence, and concealing corruption." 710 F.2d at 1179. Perhaps more than any time in history, American residents of Arab descent fear being the target of discrimination and unwarranted governmental harassment. Haddad's month-long detention on an overstayed visa, and the unprecedented secrecy surrounding his hearings (and even his location), exacerbate this climate of fear more each day. These proceedings must be opened to public scrutiny to ameliorate the growing distrust of government.

Finally, Plaintiffs must be granted access to Haddad's proceedings to ensure against the corruption feared by so many citizens. Open judicial proceedings are critical to the functioning of "our free and democratic government." Especially in the current social climate, the judiciary must exercise special care to ensure that basic constitutional guarantees are not eroded. As the renowned scholar Jeremy Bentham noted, no other check on power can substitute for openness.

> Without publicity, all other checks are insufficient: in comparison of publicity, all other checks are of small account. Recordation, appeal, whatever other institutions might present themselves in the character of checks, would be found to operate rather as cloaks than checks; as cloaks in reality, as checks only in appearance.

1 J. Bentham, *Rationale of Judicial Evidence* 524 (1827), *quoted in Richmond Newspapers*, 448

U.S. at 569. Without public scrutiny, abuse of power is assured.

## C.     Defendants' Closure of Haddad's Proceedings
## Without a Hearing and Case-Specific Findings
## Violates the Constitutional Right of Access

### 1.     Once a Presumption of Access Adheres,
### Access May Be Limited Only in Narrow
### Circumstances and Upon Specific Findings

The right of access to judicial proceedings and records guaranteed by the First Amendment can be denied in extraordinary circumstances only on the basis of articulated

14

specific findings, made after hearing, which satisfy the stringent requirements for closure established by the Supreme Court:

> The presumption [of access] may be overcome only by an overriding interest based on findings that closure is essential to preserve higher values and is narrowly tailored to serve that interest. The interest is to be articulated along with findings specific enough that a reviewing court can determine whether the closure order was properly entered.

*Press-Enterprise II*, 478 U.S. at 9-10.

It is clear that a Court must make "specific findings before closing judicial proceedings." *Press-Enterprise II*, 478 U.S. at 13. Broad, blanket closure orders are unacceptable. Any closure order must be "narrowly tailored" to further the accused's right to a fair trial. *Press-Enterprise II*, 478 U.S. at 13-14.

*Press-Enterprise II* also makes clear that hypothetical fears are insufficient to sustain a closure: "The First Amendment right of access cannot be overcome by the conclusory assertion that publicity might deprive the defendant of that right [to an impartial verdict]." 478 U.S. at 15. Further, courts may not order closure unless they first find that there are no less restrictive alternatives to closure that will adequately protect any cognizable countervailing concerns to openness. *Press-Enterprise II*, 478 U.S. at 14.

## 2.    Defendants' Categorical Denial of Access Deprived Plaintiffs of Due Process

The Creppy Memo instructed all immigration judges nationwide to conduct entirely secret proceedings in any case designated by the Attorney General. Exhibit A to the Complaint. Haddad's was one of those cases. Defendant Hacker closed all proceedings pursuant to the Creppy Memo, without any case-specific findings that the closure was necessary or was the most narrowly tailored option available.

15

At the very least, Plaintiffs are entitled to specific findings on the record as to why secrecy is warranted, and whether less restrictive options, such as redaction of specific information, is a more narrowly tailored solution to any legitimate concern the government might have. Unless the government demonstrates a sufficient countervailing interest to openness, however, full public access must be granted. What is certain is that the mere *diktat* of the Attorney General, based purely on undisclosed reasons, is not a sufficient basis for closed proceedings.

**D.    Independently of Constitutional Claims, INS
Regulations Also Entitle The Free Press to Access**

      **1.    8 C.F.R. § 3.27 Provides a Private
Cause of Action**

The INS regulations mandating public access to immigration court hearings provide a basis independent from the First Amendment for opening the Haddad case. As noted above, 8 C.F.R. § 3.27 provides that "[a]ll hearings, other than exclusion hearings, shall be open to the public." In *Pechter*, "members of the general public" successfully asserted a private cause of action against an immigration judge under the predecessor to this regulation, and received a preliminary injunction granting them access to immigration court proceedings. 441 F. Supp. at 117.[9] Similarly, Plaintiffs, as representatives of the public, are entitled to an injunction opening Haddad's hearings.

      **2.    The Regulation's Exceptions Do Not
Justify The Closure**

Eight C.F.R. § 3.27(b) provides the following exception to its mandate of openness: "For the purpose of protecting witnesses, parties, or the public interest, the Immigration Judge may

---

[9] *Cf. Haidar v. Coomey*, 401 F. Supp. 717 (D. Mass. 1974) (permitting alien to assert due process claims against immigration judge based on violations of INS regulations).

limit attendance or hold a closed hearing." This provision contains no standards to guide the exercise of this discretion.

Defendants cannot be heard to argue that this standardless exception grants them free reign to close proceedings at will. Indeed, only days ago, the Supreme Court rejected a similar argument under analogous circumstances. At issue in *EEOC v. Waffle House, Inc.*, No. 99-1823 (Jan. 15, 2002), was a statute that granted courts the discretion to limit the relief that the EEOC may recover to that which the court finds "appropriate." *Id.*, *slip op.* at 11-12. The court under review in *Waffle House* cited this statute in crafting a rule barring the EEOC from seeking certain types of relief in all actions of a particular kind. *Id.* at 3-4. The Supreme Court reversed, holding instead that a statute granting individual judges the discretion to limit relief in specific cases did not justify blanket prohibitions:

> If "appropriate "and "may recover " can be read to support respondent 's position, then any discretionary language would constitute authorization for judge-made, *per se* rules. This is not the natural reading of the text. These terms obviously refer to the trial judge 's discretion in a particular case to order reinstatement and award damages in an amount warranted by the facts of that case. They do not permit a court to announce a categorical rule precluding an expressly authorized form of relief as inappropriate in all [designated] cases . . . .

*Id.* at 12. Similarly, the INS's standardless grant of discretion to immigration judges to close cases "in the public interest" cannot be read to justify the blanket closure commanded by the Creppy Memo. Instead, closure decisions must continue to be made on a case-by-case basis, guided by the First Amendment and due process considerations outlines above.

### 3.   Injunctive Relief Is Also Available Under The APA or Mandamus Statutes

In addition to the First Amendment and INS regulations, the relief sought herein may also be premised on the Administrative Procedures Act, 5 U.S.C. § 702, which provides:

17

A person suffering legal wrong because of agency action, or adversely affected or
aggrieved by agency action within the meaning of a relevant statute, is entitled to
judicial review thereof.

*See Fitzgerald*, 467 F.2d at 766 n.54 (basing its order opening proceedings on this provision).

This statute applies to Plaintiffs, which have been "aggrieved" by the Defendants' wrongful

decision to exclude it from the Haddad hearings.

Injunctive relief may also issue on the basis of the Mandamus and Venue Act of 1962:

The district courts shall have original jurisdiction of any action in the
nature of mandamus to compel an officer or employee of the United States
or any agency thereof to perform a duty owed to the plaintiff.

28 U.S.C. § 1361.  As explained above, Defendants owe Plaintiffs the duty of permitting them

access to Haddad's proceedings.  This statute provides an alternate basis for this court to

"compel" Defendants to honor that duty.

### 4.   The Requirement of Exhausting Administrative Remedies Would Not Apply in This Case

In actions under either statute, courts often require plaintiffs to have first exhausted their

administrative remedies.  This is an entirely "prudential, court-created doctrine[, however],"

*Perkovic v. INS*, 33 F.3d 615, 619 (6th Cir. 1994), and "deference to the [agency's] conclusion as

to the utility of pursuing the claim through administrative channels is not always appropriate."

*Heckler v. Ringer*, 466 U.S. 602, 618 (1984).

There are several reasons why Plaintiffs should not be required to exhaust their claims in

the immigration courts before pursuing this action.  First, it does not appear that Plaintiffs *have*

an administrative remedy:

[INS] regulations provide no mechanism whatsoever for dealing with
claims of strangers to a proceeding . . . no procedure for interlocutory
appeals within the agency . . . [and o]bviously, by the time agency review
of the order closing the hearing could be obtained, the issue would be

18

> moot. Thus, the [Free Press] having no administrative remedy, it is entirely proper for them to address their claims to this court.

*Pechter*, 441 F. Supp. at 119 (citations omitted). Second, the exhaustion requirement does not apply to constitutional claims that are "entirely collateral to the substantive [deportation] claim." *Mathews v. Eldridge*, 424 U.S. 319, 330-31 (1976).[10] Third, the balance of equities strongly tilts in Plaintiffs' favor. None of the policy justifications for the doctrine, which include judicial economy and deference to agency expertise, would be served by requiring exhaustion of constitutional claims before an administrative agency with no interest or specialized competence in adjudicating First Amendment disputes. *See Rafeedie v. INS*, 880 F.2d 506 (D.C. Cir. 1989).

Fourth, "[i]t would be futile and unreasonable to require [Plaintiffs] to exhaust administrative remedies when the final result is preordained . . . ." *Ramon-Sepulveda v. INS*, 824 F.2d 749, 751 (9th Cir. 1987). Defendant Hacker has no discretion to disobey the directives of Defendants Creppy and Ashcroft, her highest-ranking superiors within the Department of Justice. Because it is the order of these men that Plaintiffs challenge, Plaintiffs have effectively already exhausted their administrative remedies. *Rafeedie*, 880 F.2d at 515 (where INS general counsel had issued an official opinion on an issue, the matter "ha[d] been settled by the highest legal authority within the INS," and administrative appeals had therefore been exhausted).

### E. This Motion Should Be Heard Forthwith, As Continued Closure Will Irreparably Harm the Public Interest

The need for immediate openness is all the more vital in this case, involving as it does the government's detention of a popular Muslim leader in the nation's largest Arab-American population and in the incendiary social climate following September 11th.

---

[10] *See also Stieberger v. Heckler*, 615 F.Supp. 1315, 1329 (S.D.N.Y. 1985) ("many courts have found that mandamus jurisdiction will lie where a constitutional challenge to a generally applicable [agency] policy or procedure is raised").

Moreover, delay harms vital societal interests. As the Fourth Circuit noted:

> In the context of closure of pretrial proceedings, this court has written that a "minimal delay" of access "unduly minimizes, if it does not entirely overlook, the value of 'openness' itself, a value which is threatened whenever immediate access to ongoing proceedings is denied, whatever provision is made for later public disclosure."

*Washington Post*, 923 F.2d at 331. "Timeliness of publication is the hallmark of 'news,' and the difference between 'news' and history is merely a matter of hours." *United States v. Dickinson*, 465 F.2d 496, 512 (5th Cir. 1972). The element of time is crucial if the press is to fulfill its traditional function of promptly bringing information to the public, *Nebraska Press Ass'n v. Stuart*, 427 U.S. 539, 561 (1976) , and "[t]he loss of First Amendment freedom for even minimal periods of time, unquestionable constitutes irreparable injury." *Elrod v. Burns*, 477 U.S. 347, 373 (1976) (plurality opinion). Therefore, this motion ought to be heard as soon as possible.

## IV.  CONCLUSION

Plaintiffs respectfully ask the Court to hold a hearing on this motion as soon as possible, to enter a declaratory judgment that the Creppy Memo is unconstitutional facially and as applied, and issue an injunction compelling Defendants to open all future proceedings related to Haddad to Plaintiffs, and provide Plaintiffs with a transcript of all proceedings already held in the Haddad matter.

Respectfully submitted,

HONIGMAN MILLER SCHWARTZ AND COHN LLP

By: _____
    Herschel P. Fink
    Brian D. Wassom
Attorneys for Plaintiff Detroit Free Press

SOBLE & ROWE LLP

By: _____
    Jonathan D. Rowe
Attorneys for Plaintiff Herald Co. &
   Inc. d/b/a/ Ann Arbor News

DATED:  January 29, 2002

DET_CM68458.1

20